Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
Jared Lucky (SBN 354413)
jlucky@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff and the Alleged Class*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALESSANDRO DE LA TORRE, individually and on behalf of all others similarly situated,<br><br>          *Plaintiff,*<br><br>   v.<br><br>LINKEDIN CORPORATION, a Delaware corporation,<br><br>          *Defendant.* | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR**<br><br>**(1) Violation of the Stored Communications Act, 18 U.S.C. § 2702;**<br>**(2) Breach of Contract; and**<br>**(3) Violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200**<br><br>**AND DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

Plaintiff Alessandro De La Torre ("Plaintiff" or "De La Torre") brings this Class Action Complaint and Demand for Jury Trial against LinkedIn Corporation ("LinkedIn" or "Defendant") for unlawfully disclosing its Premium customers' private messages to third parties. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief.

**NATURE OF THE ACTION**

1.     LinkedIn breached its contractual promises by disclosing its Premium customers' private messages to third parties to train generative artificial intelligence ("AI") models.[1] Given its role as a professional social media network, these communications include incredibly sensitive and potentially life-altering information about employment, intellectual property, compensation, and other personal matters.

2.     Microsoft is the parent company of LinkedIn, and Defendant claims it disclosed its users' data to third-party "affiliates" within its corporate structure, and in a separate instance, more cryptically to "another provider." LinkedIn did not have its Premium customers' permission to do so. This also raises grave privacy issues: private discussions could surface in other Microsoft products, and customers' data is now permanently embedded in AI systems without their consent, exposing them to future unauthorized use of their personal information.

3.     When it was publicly revealed that LinkedIn had unilaterally disclosed its users' data for these purposes, there was swift and harsh public backlash. LinkedIn responded the same day by discreetly modifying one of its privacy policies to account for AI-related data sharing and stated that users could choose to "opt out" of future disclosures for these purposes.

4.     But the damage was already done, and LinkedIn has not offered to delete the data from the existing AI models or retrain them to eliminate their reliance on the disclosed information.

5.     Plaintiff and members of the putative Class are Premium LinkedIn customers whose private messages were disclosed to third parties. They were not notified beforehand, did not consent to these disclosures, and their contracts were breached—especially egregious since they paid fees for membership subscriptions which include heightened privacy protections. As a result, they seek actual damages, statutory damages of $1,000 under the Stored Communications Act, 18 U.S.C. § 2707, and such other relief as may be allowed by law or equity.

---

[1] A generative AI model is an advanced machine learning system that creates new content, like text or images, by learning patterns and structures from existing data.

**PARTIES**

6.      Plaintiff is a natural person and citizen of the State of California.

7.      Defendant LinkedIn Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 1000 W Maude Ave., Sunnyvale, California, 94085.

**JURISDICTION AND VENUE**

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it raises a federal question under the Stored Communications Act, 18 U.S.C. § 2702. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

9.      This Court has jurisdiction over all other claims under 28 U.S.C. § 1367(a) as they are so related to claims in the action that they form part of the same case or controversy.

10.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District, conducts business in this District, and a substantial part of the events, decisions, or omissions giving rise to Plaintiff's claims occurred in this District.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**COMMON FACTUAL ALLEGATIONS**

*I.*      ***LinkedIn Was Exposed for Disclosing User Data to Third Parties to Train Generative AI Models, Then Attempted to Cover Its Tracks***

12.     LinkedIn is the internet's largest professional social networking platform. The company promotes its platform as a tool that people "can use . . . to find the right job or internship, connect and strengthen professional relationships, and learn the skills you need to succeed in your career." LinkedIn's services are accessible via desktop, mobile app, and mobile web.

13.     LinkedIn offers both free and "Premium" (paid) tiers of service. All users must agree to a User Agreement and Privacy Policy when registering for an account. Premium customers agree to additional terms, including enhanced privacy protections, which are detailed below.

14.     In August 2024, LinkedIn quietly introduced a new privacy setting to its settings menu (shown below), which ostensibly allowed users to enable or disable the sharing of their personal data for the purpose of training generative AI models.



15.     This setting was enabled by default, automatically opting users in to a program that allowed LinkedIn and its "affiliates" to train generative AI models with users' personal data.[2]

16.     On September 18, 2024, multiple news outlets reported on this new privacy setting and questioned a LinkedIn spokesperson about why LinkedIn had not disclosed its sharing of users' personal data for generative AI training in its terms of service. LinkedIn responded with the statement: "We'll be sharing an update on our Terms of Service with our members shortly."

17.     On the same day, September 18, 2024, LinkedIn discreetly updated its Privacy Policy, adding a description of its processing of user data for generative AI purposes.

---

[2] LinkedIn defines "affiliates" as "companies controlling, controlled by or under common control with us, including, for example, LinkedIn Ireland, LinkedIn Corporation, LinkedIn Singapore and Microsoft Corporation."

Defendant's edits appear to acknowledge that its disclosure of user data exceeded the scope of its original consent to process users' data, evidenced by the modifications shown below as tracked changes:

> 2. How We Use Your Data
>
> We use your data to provide, support, personalize and develop our Services.
>
> How we use your personal data will depend on which Services you use, how you use those Services and the choices you make in your settings. We may use your personal data to improve, develop, and provide products and Services, develop and train artificial intelligence (AI) models, develop, provide, and personalize our Services, and gain insights with the help of AI, automated systems, and inferences, so that our Services can be more relevant and useful to you and others. You can review LinkedIn's Responsible AI principles here and learn more about our approach to generative AI *here.* Learn more about the inferences we may make, including as to your age and gender and how we use them.

18.     Most notably, LinkedIn buried a crucial disclosure in an "FAQ" hyperlink (shown in italics above) rather than in the Privacy Policy:[3] "The artificial intelligence models that LinkedIn uses to power generative AI features may be trained by LinkedIn *or another provider*" (emphasis added). Admitting that data may be disclosed to "another provider" in this secondary document suggests that LinkedIn was aware its previous terms did not authorize these practices and was attempting to avoid further scrutiny.

19.     Additionally, the FAQ states: "Opting out means that LinkedIn and its affiliates won't use your personal data or content on LinkedIn to train models going forward, but does not affect training that has already taken place." LinkedIn gives up the game with this statement—it indicates that LinkedIn users' personal information is already embedded in generative AI models and will not be deleted, regardless of whether they opt out of future disclosures.

20.     This modification of its Privacy Policy also violates LinkedIn's promise not to update the terms of its Privacy Policy without first notifying users of the impending change and providing an opportunity to cancel their accounts if they object:

> LinkedIn ("we" or "us") can modify this Privacy Policy, and if we make material changes to it, we will provide notice through our Services, or by other means, to

---

[3] FAQ hyperlink: https://www.linkedin.com/help/linkedin/answer/a5538339

provide you the opportunity to review the changes before they become effective. If you object to any changes, you may close your account.

21.    In yet another sleight of hand, LinkedIn quietly altered a statement in the aforementioned FAQ. The previous version of the FAQ stated: "Where LinkedIn trains generative AI models, we seek to minimize personal data in the data sets used to train the models, including by using privacy enhancing technologies to redact or remove personal data from the training dataset." On or around October 1, 2024, LinkedIn removed the words "including by using privacy enhancing technologies to redact or remove personal data from the training dataset." In other words, LinkedIn is not actually undertaking the privacy-protecting actions it promised users it would implement after unlawfully disclosing their personal data to train generative AI models.

22.    LinkedIn's actions, including discreetly introducing a new privacy setting, concealing critical data disclosures, and stealthily altering its privacy policies and statements, indicate a pattern of attempting to cover its tracks. This behavior suggests that LinkedIn was fully aware that it had violated its contractual promises and privacy standards and aimed to minimize public scrutiny and potential legal repercussions.

## II.    LinkedIn Disclosed Private Messages to Train AI Models in Breach of Contract with Its Premium Customers

### A.    LinkedIn Offers Premium Customers Additional Privacy Assurances Not Available to Free Users

23.    LinkedIn Premium customers like Plaintiff and the Class members here must agree to an additional contract when purchasing a LinkedIn Premium subscription, known as the "LinkedIn Subscription Agreement" ("LSA").[4]  The LSA promises Premium customers enhanced privacy protections compared to the User Agreement and Privacy Policy, including terms that specifically apply to the processing and disclosure of LinkedIn Premium customers' personal information.

---

[4] https://www.linkedin.com/legal/l/lsa

24.     In Section 3.2 of the LSA, LinkedIn promises not to disclose its Premium customers' confidential information[5] to third parties:

> 3.2.     Limited Use and Non-Disclosure. Recipient will (a) use Confidential Information only for the purposes of furthering the business relationship between the parties; (b) protect Confidential Information using the same degree of care it uses to protect its own confidential information of a like nature, but in no event less than a reasonable degree of care; (c) not disclose Confidential Information to any third party except (1) to Affiliates or employees, students, consultants, and agents who (i) have a need to know it in order to carry out their obligations under the Agreement, and (ii) are under written confidentiality and non-use obligations at least as restrictive as those stated in this LSA or (2) as required by law; and (d) not modify, reverse engineer, decompile, create other works from, or disassemble any Confidential Information, to the extent applicable, unless authorized in writing by discloser.

25.     LinkedIn breached Section 3.2 by disclosing its Premium customers' private and confidential communications to third parties to train generative AI models. This disclosure to and processing by third parties was not permitted under the LSA, and LinkedIn should have reasonably known the information was confidential given the sensitive nature of the messages it disclosed, as discussed further below.

26.     Section 2.3 of the LSA states that LinkedIn processes its Premium customers' Personal Data in compliance with the terms outlined in its Data Protection Agreement ("DPA"), which is incorporated by reference into the LSA. LinkedIn also violates the terms of its DPA.

                i.     _LinkedIn's Violates the DPA's Data Processing Promises_

---

[5] The LSA defines Confidential Information in Section 3 as "any information disclosed under the Agreement that (a) if tangible, is clearly marked as "Confidential" or with a similar designation; (b) if intangible, is identified as "Confidential" by discloser at the time of disclosure and confirmed in writing to recipient as being Confidential Information; or (c) from the relevant circumstances should reasonably be known by recipient to be confidential (e.g., pricing, non-public Personal Data, etc.). Confidential Information does not include any portion of the information that recipient can prove (a) was rightfully known to recipient before receipt from discloser; (b) was generally known to the public on the Effective Date; (c) becomes generally known to the public after the Effective Date, through no fault of recipient; (d) was received by recipient from a third party without any confidentiality obligation; or (e) was independently developed by recipient without breach of this Section 3."

27.     Section 5.1(a) of the DPA, quoted below, details the specific purposes for which LinkedIn is permitted to process its Premium customers' Personal Data:

> 5.1 Processing Requirements. LinkedIn will:
>
> a. Process Customer Personal Data (i) only for the purpose of providing, supporting and improving LinkedIn's services (including to provide insights and other reporting), using appropriate technical and organizational security measures; and (ii) in compliance with the instructions received from Customer. LinkedIn will not use or Process the Customer Personal Data for any other purpose. LinkedIn will promptly inform Customer in writing if it cannot comply with the requirements under Sections 5-8 of this DPA, in which case Customer may terminate the Agreement or take any other reasonable action, including suspending data processing operations[.]

28.     LinkedIn breached these terms by using Premium customers' data to train third-party generative AI models, a use that falls outside of the specified purposes. This violated the explicit promise that users' personal data would be processed only to provide, support, and improve LinkedIn services.

29.     LinkedIn's contemporaneous edits to parallel language in its Privacy Policy is further evidence that LinkedIn's unauthorized use of its Premium customers' data violated the DPA. Prior to changes made on September 18, 2024, LinkedIn's Privacy Policy stated that LinkedIn would process data to "provide, support, personalize and develop our Services." After LinkedIn faced public pushback for its new generative AI improvement setting, the allowable purposes for processing in the Privacy Policy were modified to state that user data could also be processed for training generative AI.

30.     By contrast, LinkedIn failed to similarly update the DPA. This omission suggests an attempt to further avoid detection given that the DPA explicitly governs the processing of Premium customers' personal data.

31.     Based on a reading of the DPA's data processing terms, no reasonable person would anticipate LinkedIn disclosing their personal data to third-party providers for the extensive and permanent purpose of training AI models (at least, not without first obtaining additional consent).

ii.    _LinkedIn's Violates the DPA's Data Disclosure Promises_

32.    According to the DPA, the only third parties permitted to process Premium customers' personal data are designated "Subprocessors" listed on a webpage hyperlinked in the DPA. The webpage includes each Subprocessor's company name and the specific services that Subprocessor is authorized to provide in processing customer data.

33.    None of the Subprocessors are authorized to process Premium customers' data for the purpose of training generative AI models.

34.    Notably, the webpage lists "Microsoft Corporation and its Affiliates" as a Subprocessor, describing their authorized services as "Microsoft 365, Fraud Protection, Professional Services, Customer Support, Survey comment translation services." No reasonable consumer would think that description authorizes Microsoft or its affiliates to train generative AI models using the private data of LinkedIn Premium customers.

35.    In addition, Section 5.5 of the DPA outlines LinkedIn's obligations in the event of a "Personal Data Breach," defined as "any accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to Customer Personal Data.":

> 5.5 If a Personal Data Breach results from either (i) the negligence or intentional misconduct of LinkedIn (or any LinkedIn Subprocessor consistent with Section 5.1(f)) or (ii) a material failure of LinkedIn to comply with the terms of this DPA, LinkedIn shall bear all costs associated with investigating and remediating the Personal Data Breach. LinkedIn shall provide reasonable reimbursement to Customer for any costs associated with notifying affected individuals as required by law or providing individuals with credit monitoring or other appropriate remediation services, provided that LinkedIn, as a processor, will adhere to its commitments under 5.3(b) of this DPA.

36.    In Section 5.5, LinkedIn commits to bearing all costs related to investigating and remediating a Personal Data Breach, including unauthorized disclosure of customers' personal data.

37.     LinkedIn breached this obligation by failing to investigate or remediate its own unauthorized disclosure of Premium customers' data for AI model training, thereby failing to fulfill its commitments under the DPA.

**B.  _LinkedIn Unlawfully Disclosed its Premium Customers' Private InMail Messages_**

38.     In addition to enhanced data protection, LinkedIn's Premium tiers offer a feature called "InMail," which allows Premium customers to directly message other LinkedIn members with whom they are not currently "connected"—meaning individuals outside their network of known contacts. In one promotional statement, LinkedIn describes one use for InMail as follows: "Message hiring managers directly and boost your chances of hearing back. It's 4.6x more effective than email."

39.     Premium customers receive a specific number of InMail message "credits" per month, determined by their subscription type. Below are examples of Premium tiers, including LinkedIn's descriptions, total monthly InMail credits, and monthly costs.

| Plan | Description | InMail Monthly Credits | Monthly Fee |
|------|-------------|------------------------|-------------|
| Premium Career | helps you get hired and get ahead in your professional life | 5 | $39.99 |
| Premium Business | helps you get detailed business insights and further expand your business | 15 | $69.99 |
| Sales Navigator | helps you generate leads and build your clientele | 50 | $99.99 |
| Recruiter Lite | helps you find and hire talent | 30 | $169.99 |

40.     People use InMail for a variety of purposes, including soliciting business from new contacts, seeking new employment opportunities, reconnecting with former colleagues, discussing sensitive business matters, and reaching out in a personal capacity to old friends or relatives. The confidential nature of these communications highlights the critical importance of privacy for Premium customers.

41.    Because of the sensitivity of private messages, many of LinkedIn's rival social media networks have explicitly stated they never use the contents of users' private messages for AI training. But to date, LinkedIn has never publicly denied that it disclosed the contents of its Premium customers' InMail messages to third parties for the purpose of training generative AI models.

42.    As paying subscribers, Premium customers are entitled to enhanced privacy protections, including the confidentiality of their InMail messages. The unauthorized disclosure of these messages constitutes a breach of LinkedIn's promises as set forth in the LSA and DPA. As a result, Premium customers are entitled to seek actual damages for this breach.

### III.    The Harms Caused by LinkedIn's Actions

43.    LinkedIn has a stated set of AI principles, which includes "Provide Transparency: We seek to explain in clear and simple ways how our use of AI impacts people." Defendant has clearly failed to adhere to these principles and, worse, chose to cover up its transgressions rather than take accountability by deleting the relevant generative AI models or retraining them to eliminate their reliance on the improperly obtained data.

44.    The extensive reach of Microsoft's ecosystem makes disclosures to entities within its corporate structure particularly problematic. Private data could surface across Microsoft's AI product suite, such as confidential job searches appearing in Word suggestions, business strategies in Teams chat completions, or salary discussions in Microsoft 365 features. Each AI product represents a potential point for data leakage, posing the harm of potential privacy breaches.

45.    Moreover, LinkedIn's own statements suggest that data was disclosed to other third-party providers not included within Microsoft's corporate structure, heightening these concerns. Embedding personal communications in the AI models of unknown third-party providers without explicit consent may lead to unintended profiling, biased decisions, and misuse in sensitive contexts like employment.

46.    Beyond individual harms, LinkedIn's actions highlight a growing issue in the tech industry. If left unchecked, such unauthorized use of customers' personal data for training

generative AI models could lead to widespread misuse of personal information, fueling discrimination, identity theft, and erosion of public trust. This case underscores the urgent need for companies to implement robust and transparent systems to protect privacy and ensure ethical AI development and use.

**FACTS SPECIFIC TO PLAINTIFF ALESSANDRO DE LA TORRE**

47.     Plaintiff Alessandro De La Torre purchased a LinkedIn Premium subscription in July 2021.

48.     Between July 2021 and September 2024, Plaintiff sent and received numerous InMail messages containing sensitive and private information.

49.     The contents of Plaintiff's InMail messages included discussions about potential financing for startups, job-seeking efforts, and attempts to reconnect with former colleagues.

50.     The exposure of such information could jeopardize Plaintiff's professional relationships, compromise business opportunities, and negatively impact his career prospects.

51.     Upon information and belief, Plaintiff's private and confidential InMail messages were disclosed to third parties for the purpose of training generative AI models. Plaintiff did not consent to his private InMail messages being disclosed for this purpose.

52.     Consequently, Plaintiff did not receive the promised benefit of a Premium subscription, which was supposed to include heightened data privacy protection for his InMail messages.

**CLASS ACTION ALLEGATIONS**

53.     **Class Definition**: Plaintiff Alessandro De La Torre brings this proposed class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of himself and a Class (collectively the "Class") of all others similarly situated, defined as follows:

> All LinkedIn Premium customers that sent or received InMail messages and whose private communications were disclosed by LinkedIn with third-party entities, including other Microsoft affiliates, for AI training purposes prior to September 18, 2024.

54.     Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling

interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

55.    **Numerosity**: The exact number of Class members is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, Defendant has millions of customers who fall into the definition of the Class. Class members can be identified through Defendant's records.

56.    **Commonality and Predominance**: There are questions of law and fact common to the claims of Plaintiff and the putative Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not limited to the following:

    (a)  Whether Defendant disclosed its Premium customers' private InMail messages to third parties for the purpose of training generative AI models;

    (b)  Whether Defendant obtained consent from its Premium customers to disclose their private InMail messages to third parties for the purpose of training generative AI models;

    (c)  Whether Defendant breached its contracts with Premium customers;

    (d)  Whether Defendant acted knowingly;

    (e)  Whether LinkedIn functions as an Electronic Communications Service or a Remote Computing Service within the meaning of the Stored Communications Act;

    (f)  Whether Plaintiff and the Class members are entitled to statutory damages; and

    (g)  Whether Plaintiff and the Class members are entitled to injunctive relief.

57.    **Typicality**: Plaintiff's claims are typical of the claims of members of the Class in that Plaintiff, like all members of the Class, had his private communications unlawfully disclosed and has been injured by Defendant's misconduct at issue.

58.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class. Plaintiff and the members of the Class sustained injuries and damages as a result of Defendant's conduct. Plaintiff also has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to the Class.

59.     **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

60.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definitions" based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violation of Stored Communications Act**
**18 U.S.C. § 2702**
**(On behalf of Plaintiff and the Class)**

61.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

62.     The Stored Communications Act ("SCA") defines an Electronic Communication Service ("ECS") as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). The SCA prohibits an ECS provider from "knowingly divulg[ing] to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

63.    The SCA defines a Remote Computing Service ("RCS") as "the provision to the public of computer storage or processing services by means of an electronic communications system." 18 U.S.C. § 2711(2). The SCA prohibits an RCS provider from "knowingly divulg[ing] to any person or entity the contents of any communication which is carried or maintained on that service." 18 U.S.C. § 2702(a)(2).

64.    In the modern computing environment, many companies, including LinkedIn, offer both ECS and RCS services. The relevant analysis focuses on the nature of the service or communication at issue to determine the role the provider plays at a given time.

65.    LinkedIn is an ECS provider because it offers its users, *inter alia,* the ability to send and receive private messages. Messages that are not yet opened are in "electronic storage" as defined by the SCA, since they are in temporary, immediate storage. 18 U.S.C. § 2510(17)(A).

66.    Defendant is also an RCS provider, because it offers, *inter alia,* storage services for messages that have already been opened by users. U.S.C. § 2702(a)(2). InMail messages that have previously been opened are retained for backup storage purposes in the Premium customer's inbox. *Id.*

67.    LinkedIn violated the SCA when it knowingly disclosed the contents of Plaintiff and the Class Members' private InMail messages to third-party entities. 18 U.S.C. § 2702(a). More specifically, LinkedIn violated § 2702(a)(1) by disclosing unopened InMail messages to third-party entities in its capacity as an ECS provider. Defendant also violated § 2702(a)(2) by disclosing previously opened InMail messages that were then held on its servers for storage purposes to third-party entities in its capacity as an RCS provider.

68.    None of the SCA's disclosure exceptions apply to LinkedIn's conduct. 18 U.S.C. § 2702(b).

69.    The intended recipients of the communications described herein were the senders and receivers of private InMail messages, not unknown third parties for purposes of training generative AI models.

70.    LinkedIn did not obtain consent from the Plaintiff, the Class members, or any intended recipients for these disclosures; instead, they were made surreptitiously to unknown

third parties. Any purported consent in the LSA or DPA did not extend to LinkedIn's disclosure of customers' personal data so that third parties could train generative AI models. LinkedIn's actions therefore exceeded the scope of its agreement with customers.

71.    The disclosures were not necessary for providing LinkedIn's services as a professional social media network. Instead, they served the purpose of training AI models by unknown third parties, which is not justified under the LSA, DPA, or other agreements.

72.    These disclosures involved the "contents" of Plaintiff's and the Class members' communications. The disclosed contents included the substance of private InMail messages sent and received by Plaintiff and the Class members.

73.    A reasonable consumer reading the LSA and the DPA would not understand that they were consenting to the disclosure of their private communications to third parties for the purpose of embedding them in generative AI models. This action contradicts the company values and express promises set forth in LinkedIn's agreements.

74.    LinkedIn acted knowingly at all times with respect to the conduct described herein. The public became aware of LinkedIn's improper disclosures through LinkedIn's own statements and actions, such as the introduction of a new privacy setting. This setting revealed that customer data was already being disclosed to train generative AI models.  LinkedIn modified its Privacy Policy on September 18, 2024, in an attempt to retroactively justify its actions by purporting to obtain user consent for conduct that occurred without consent before that date.

75.    Plaintiff, on behalf of himself and the Class, seeks actual damages for the diminished value of LinkedIn's services as actually offered, since Premium customers paid for services that included promised privacy protections which were not delivered. The failure to uphold these privacy commitments reduces the value of LinkedIn's Premium services for Plaintiff and the Class, resulting in financial loss and a deprivation of the bargained-for services.

76.    Pursuant to 18 U.S.C. § 2707(b), Plaintiff on behalf of himself and the Class seeks equitable relief in the form of algorithmic disgorgement—the deletion or destruction of all

models and algorithms trained using their private InMail messages to avoid the future irreparable harms alleged herein.

77.    In addition, Plaintiff, on behalf of himself and the Class, seeks statutory damages of $1,000 per person under the SCA, 18 U.S.C. § 2707, plus pre- and post-judgment interest, reasonable attorneys' fees, costs, and any other relief allowed by law.

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(<u>On behalf of Plaintiff and the Class</u>)**

78.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

79.    LinkedIn's Terms of Service, Privacy Policy, LSA, and DPA represent a valid and enforceable contract between LinkedIn and its Premium customers, including Plaintiff and the Class members.

80.    Premium LinkedIn customers, like Plaintiff and the Class, pay monthly subscription fees for heightened benefits, including InMail private messages and enhanced privacy and data protections, including those set forth in the LSA and DPA.

81.    Plaintiff and the Class members have performed their duties under the contract by paying their monthly subscription fees to LinkedIn.

82.    LinkedIn breached Section 3.2 of the LSA, and Sections 5.1 and 5.5 of the DPA by disclosing the private InMail messages of Plaintiff and the Class members to unknown third parties for the purpose of training generative AI models.

83.    Further, LinkedIn's Privacy Policy contains an explicit commitment regarding material changes:

> LinkedIn ("we" or "us") can modify this Privacy Policy, and if we make material changes to it, we will provide notice through our Services, or by other means, to provide you the opportunity to review the changes before they become effective. If you object to any changes, you may close your account.

84.    LinkedIn breached this promise by disclosing Plaintiff and the Class's private InMail messages to third parties, and only updating its privacy policy after the practices were exposed. No opportunity was provided to Plaintiff or the Class to close their accounts, as

1  promised.

2     85.     As a result of the breaches, Plaintiff and the Class members suffered actual

3  damages, in the form of overpayment for LinkedIn Premium subscriptions that did not include

4  the promised data privacy protections for their private InMail messages. In other words, Plaintiff

5  and the Class did not receive the benefit of the bargain, in that they received a less valuable

6  service than the subscriptions they paid for.

7     86.     For these breaches, Plaintiff, on behalf of himself and the Class, seeks actual

8  damages to be determined at trial plus pre- and post-judgment interest, costs, and such other

9  relief as allowed by law.

10                    **THIRD CAUSE OF ACTION**
   **Violation of California's Unfair Competition Law ("UCL")**
11                   **Cal. Bus. & Prof. Code § 17200**
              (<u>**On behalf of Plaintiff and the Class**</u>)

12

13    87.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

14    88.     California's Unfair Competition Law ("UCL") prohibits unfair competition in the

15  form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue

16  or misleading advertising[.]" Cal. Bus. & Prof. Code § 17200. The UCL allows "a person who

17  has suffered injury in fact and has lost money or property" to prosecute a civil action for

18  violation of the UCL. *Id.* § 17204.

19    89.     LinkedIn violated the UCL's "unfair" prong by disclosing Plaintiff and the Class

20  members' private InMail messages in breach of its Privacy Policy, LSA, and DPA. As alleged

21  herein, LinkedIn violated its specific contractual obligations regarding the purposes for which it

22  processes personal information and the companies may share data with.

23    90.     LinkedIn's actions constitute an unfair business practice because they are

24  immoral, oppressive, unscrupulous, and substantially injurious to consumers. In February 2024,

25  the FTC stated: "It may be unfair or deceptive for a company to adopt more permissive data

26  practices—for example, to start sharing consumers' data with third parties or using that data for

27  AI training—and to only inform consumers of this change through a surreptitious, retroactive

28

amendment to its terms of service or privacy policy."[6] This is exactly what LinkedIn did.

91.    In addition, LinkedIn's actions are unfair because they violate the United States' public policy of protecting consumers' stored communications, as well as the California Business and Professions Code § 22576, which prohibits website operators from failing to comply with their privacy policies.

92.    LinkedIn's actions alleged herein are also "unlawful" within the meaning of the UCL because they violated the Stored Communications Act, 18 U.S.C. § 2702, as well as the California Business and Professions Code § 22576.

93.    Plaintiff and the Class member suffered injury in fact and lost money as a result of LinkedIn's actions, in that they overpaid for LinkedIn premium subscriptions that included promises to protect the privacy of their private InMail messages, and their personal data more generally, and did not receive the full value of the services they bargained for.

94.    Under Cal. Bus. & Prof. Code § 17203, Plaintiff and the Class seek restitution of all amounts overpaid in connection with their Premium subscriptions, as well as injunctive relief to in the form of algorithmic disgorgement—the deletion or destruction of all models and algorithms trained using their private InMail messages to avoid the future harms alleged herein.

95.    Injunctive relief is appropriate because Plaintiff and the Class have suffered irreparable injuries. LinkedIn has used their private InMail messages to train its AI models and will not delete that personal data from its models. Monetary damages alone are insufficient, and given the balance of hardships—including the potential future harm from unauthorized data use—a remedy in equity is warranted. The public interest would not be harmed by a permanent injunction, as the public interest is served by requiring digital platform companies to adhere to their own stated Privacy Policies.

96.    Plaintiff, individually and on behalf of the Class, brings this action to enforce an important right affecting the public interest, and therefore also seek an award of attorneys' fees

---

[6] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/02/ai-other-companies-quietly-changing-your-terms-service-could-be-unfair-or-deceptive

under Cal. Civ. Proc. Code § 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually and on behalf of the Class, prays for the following relief:

(a)    An order certifying the Class as defined above, appointing Alessandro De La Torre as the representative of the Class, and appointing his counsel as Class Counsel;

(b)    An order declaring that Defendant's actions, as set out above, violate the Stored Communications Act, 18 U.S.C. § 2702;

(c)    An order declaring that Defendant's actions, as set out above, breached the contracts between LinkedIn and its Premium customers;

(d)    An order declaring that Defendant's actions, as set out above, are unfair and unlawful under the UCL;

(e)    An injunction requiring algorithmic disgorgement, that is, ordering Defendant to delete or destroy all models and algorithms trained using their private InMail messages in violation of the SCA, 18 U.S.C. § 2702, UCL, and in breach of contract, and to cease processing and disclosing their personal data in the future without proper consent;

(f)    An award of all damages allowed by law, including statutory damages, actual damages, disgorgement of profits, punitive damages, costs, and attorneys' fees;

(g)    Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

**ALESSANDRO DE LA TORRE,** individually and on behalf of all others similarly situated,

Dated: January 21, 2025

By: _/s/Jared Lucky_
*One of Plaintiff's Attorneys*

Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
Jared Lucky (SBN 354413)
jlucky@edelson.com

EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff and the Putative Class*